AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 2-12-2020)

# UNITED STATES DISTRICT COURT

for the

## Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| Information associated with Six (6) Target | )   Case No.  MJ20-117 |
| Accounts/Identifiers, for Investigation of | ) |
| 21 U.S.C. § 841 and Other Offenses | ) |

### APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A-1 & A-2, located in: the Western District of Washington, there is now concealed property and evidence described in Attachment B.  This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crip P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution of Controlled Substances |
| 21 U.S.C. § 841 & 846 | Conspiracy to Distribute Controlled Substances |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits.  Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

☒ Delayed notice of 90 days (give exact ending date if more than 30 days: June 9, 2020, is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:
☒ by reliable electronic means; or ☐ telephonically recorded

_____
*Applicant's signature*

Geoffrey Provenzale, Special Agent
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or
☒ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by telephone/

Date: March 11, 2020

_____
*Judge's signature*

Michelle L. Peterson, United States Magistrate Judge
City and state:  Seattle, Washington                    *Printed name and title*

USAO 2019R00697 (TT1 Extension)

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS AND PEN-TRAP ORDERS**

STATE OF WASHINGTON        )
                                                          )        ss
COUNTY OF KING                      )

I, Geoffrey Provenzale being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. I make this affidavit in support of an application for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the following cellular telephones:

a. **Target Telephone 21**, assigned call number **206-476-3701** with International Mobile Subscriber Identity (IMSI) 310260078464970. **TT21** has a listed subscriber of "Fernando Vasquez" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT21** is described herein and in Attachment A-1, and the location information to be seized is described herein and in Attachment B. **TT21** is utilized by Jose Fernando Escoto-Fiallos.

b. **Target Telephone 22**, assigned call number **206-578-9597** with IMSI 310260060984245. **TT22** has a listed subscriber of "Soledad Vazquez" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT22** is described herein and in Attachment A-1, and the location information to be seized is described herein and in Attachment B. **TT22** is utilized by Jorge Cruz-Hernandez.

c. **Target Telephone 43**, assigned call number **971-224-9106** with IMSI 310260350480619. **TT43** has a listed subscriber of "Leon Levis" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT43** is described herein and in Attachment A-1, and the location information to be seized is described herein and in Attachment B. **TT43** is believed to be utilized by Delmer Velasquez-Licona.

d. **Target Telephone 44**, assigned call number **425-426-7588** with IMSI 310260185523947. **TT44** has a listed subscriber of "Trinidad A Galeana" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT44** is described herein and in Attachment A-1,

Affidavit of SA Provenzale - 1
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and the location information to be seized is described herein and in Attachment B. **TT44** is utilized by unidentified female (UF) 7588.

     e.    **Target Telephone 45**, assigned call number **707-631-6709** with IMSI 310150730417601. **TT45** has a listed subscriber of "Angelica Castillon" and has service provided by AT&T/Cricket Wireless, wireless telephone service providers headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408. **TT45** is described herein and in Attachment A-2, and the location information to be seized is described herein and in Attachment B. **TT45** is believed to be utilized by Jorge Uriel Esquivel-Mena.

     f.    **Target Telephone 46**, assigned call number **425-496-4703** with IMSI 310260071600170. **TT46** has a listed subscriber of "Wilmer Avila" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. **TT46** is described herein and in Attachment A-1, and the location information to be seized is described herein and in Attachment B. **TT46** is utilized by unidentified male (UM) 4703.

2.    The wireless telephone service providers identified in Paragraph 1(a) through (f) are referred to throughout this affidavit and attachments as the "wireless provider," "the wireless service providers," or "the wireless service providers identified in Attachment A-1 and A-2."

ECPA

3.    The Court has jurisdiction to issue the proposed warrant under the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

Pen Register Act

4.    Because this warrant seeks the prospective collection of information that falls within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

Affidavit of SA Provenzale - 2
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

5.      The Court has jurisdiction to issue the requested pen-trap order because it is a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2).  Specifically, the Court is a district court of the United States that "has jurisdiction over the offense being investigated." 18 U.S.C. § 3127(2)(A)(i).

6.      This application includes all the information required by the Pen Register Act.  *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1).  Namely, Exhibit 1 to this application is a certification from Assistant United States Attorney Stephen Hobbs that (1) identifies DEA as the law enforcement agency conducting the investigation and (2) certifies the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency.  18 U.S.C. § 3122(b).  The Assistant United States Attorney is an "attorney for the government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

7.      A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted."  18 U.S.C. § 3127(3).  A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."  18 U.S.C. § 3127(4).

8.      In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls.  Similar principles apply to other kinds of wire and electronic communications such as emails, text messages, connection logs, and data transfers.  The prospective location data sought in this application constitutes "dialing, routing, addressing, and signaling information" covered by the Pen Register Act.  Accordingly, the requested warrant will record, decode, and/or capture dialing, routing, addressing, and signaling information associated with the Target Cell Phone without geographic limit.

Affidavit of SA Provenzale - 3
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

9.     The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order through Attachment B of the requested warrant that the wireless service providers described in Attachment A-1 and A-2, and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this warrant furnish, upon service of the warrant, information, facilities, and technical assistance necessary to install the pen/trap, including installation and operation of the pen-trap unobtrusively and with minimum disruption of normal service.  Any entity providing such assistance shall be reasonably compensated by the DEA, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of the warrant.

10.     **Through this application, the United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).**

## AGENT BACKGROUND

11.     I am employed as a Special Agent (SA) with the United States Drug Enforcement Administration (DEA), and have been so employed since April 2015.  I am currently assigned to the Seattle Field Division.  I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code, Section 801 et seq. and Title 18, United States Code, Section 2516(1).  In this capacity, I investigate violations of the Controlled Substance Act, Title 21, United States Code, Section 801 et seq., and related offenses.  I have received specialized training in the enforcement and investigation of the Controlled Substance Act. I have received over 620 hours of classroom training including but not limited to, drug identification, drug interdiction, detection, money laundering techniques and schemes, smuggling, and the investigation of individuals and/or organizations involved in the

Affidavit of SA Provenzale - 4
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

illegal possession, possession for sale, sales, importation, smuggling, cultivation, manufacturing and illicit trafficking of controlled substances.

12.     In my role as a Special Agent for the Drug Enforcement Administration, I have negotiated for and purchased narcotics acting in an undercover capacity.  I have participated in narcotics investigations (i.e. heroin, fentanyl, cocaine, marijuana, and methamphetamine) which have resulted in the arrest of individuals and the seizure of narcotics and/or narcotic-related evidence and the forfeiture of narcotics related assets.  I have been involved in the service of search warrants as part of these investigations.  As a result of my experience in serving these search warrants, I have encountered and have become familiar with various tools, methods, trends, paraphernalia and related articles utilized by various traffickers in their efforts to import, conceal, and distribute controlled substances.  I am also familiar with the various methods of packaging, delivering, transferring, and laundering drug proceeds.  Additionally, through my training and experience, I can identify illegal drugs by sight, odor, and texture.

13.     I have also worked on drug investigations involving the use of court-authorized wiretaps under Title III.  In that capacity, I have had the opportunity to monitor, listen to, and review transcripts and line sheets in both English and Spanish (prepared by linguists) documenting the content of hundreds of intercepted conversations involving the trafficking of cocaine, methamphetamine, heroin, and other narcotics, by persons who used some form of code to thwart law enforcement.  I have also interviewed defendants at the time of their arrest and have debriefed, spoken with, and/or interviewed numerous drug dealers or confidential sources (informants) at proffer and safety valve interviews who were experienced in speaking in coded conversation over the telephone. In many of these interviews and debriefings, I was able to speak with these drug traffickers about specific conversations in which they were intercepted pursuant to electronic surveillance.  From these interviews, and also from discussions with other experienced investigators, I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by drug traffickers in the course of their criminal

Affidavit of SA Provenzale - 5
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

activities, including their use of firearms to protect their narcotics related activities and use of cellular telephones as a means to facilitate communications while avoiding law enforcement scrutiny.

14.     I have written affidavits in support of court authorized federal warrants and orders in the Western District of Washington for T-III interceptions, GPS tracking of telephones, search warrants, and tracking of vehicles.  Additionally, I have testified in grand jury proceedings, written investigative reports, and conducted and participated in numerous interviews of drug traffickers with various roles in drug organizations, which has provided me with a greater understanding of the methods by which drug trafficking organizations operate.

15.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and pen-trap, and therefore does not set forth all of my knowledge about this matter.  This affidavit describes intercepted Spanish-language communications.  DEA linguists have translated those communications into English.  Except where otherwise indicated, the quotations of communications below are the English translations of the original Spanish communications.

16.     Based on the facts set forth in this affidavit, there is probable cause to believe that the **target telephones** described herein have been used in the Western District of Washington in furtherance of the following federal criminal offense: Distribution of Controlled Substances, in violation of 21 U.S.C. § 841(a)(1), and/or conspiracy to commit that same offense in violation of 21 U.S.C. § 846, as well as Money Laundering, and conspiracy to commit the same, in violation of 18 U.S.C. § 1956.  There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

Affidavit of SA Provenzale - 6
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**PROBABLE CAUSE**

17.     The United States, including the DEA, is conducting a criminal investigation of a drug trafficking organization (DTO) operating in the Western District of Washington which distributes narcotics, including heroin, methamphetamine, cocaine, and fentanyl.  Investigators believe Gustavo Sandoval-Agurcia and Delmer Velasquez-Licona are re-distributors for the DTO, Rodrigo Alvarez-Quinonez and Jorge Uriel Esquivel-Mena are sources of supply for the DTO, and Jorge Cruz-Hernandez, Jose Fernando Escoto-Fiallos, UF7588, and UM4703 are narcotics associates of members of the DTO as described herein.

18.     Since late November 2019, investigators have received multiple court authorizations in the Western District of Washington to intercept wire and electronic communications to and from phones utilized by members of the DTO.  As it pertains to this application, these include:

19.     On December 6, 2019, the Honorable U.S. District Court Judge Ricardo S. Martinez signed an order authorizing the interception of the wire and electronic communications over 206-231-8342/TT18.[1]  Interception of TT18 began on or about December 6, 2019.  TT18 was utilized by Delmer Velasquez-Licona, a redistributor for the DTO.  Wire and electronic interceptions of TT18 ended on January 4, 2020.

20.     On January 9, 2020, the Honorable U.S. District Court Judge James L. Robart signed an order authorizing the continued interception of the wire and electronic communications to and from 206-531-9979/TT18, and authorizing the initial interception of the wire and electronic communications to and from 425-496-3287/TT19 (utilized by Rodrigo Alvarez-Quinonez, a source of supply for the DTO) and 206-929-8743/TT23 (utilized by Gustavo Sandoval-Agurcia, a redistributor for the DTO).  Interception of the three phones terminated on February 7, 2020.

---

[1] TT18 was originally assigned phone number 206-231-8342, however, according to T-Mobile, the phone number was changed on December 20, 2019, to 206-531-9979.  The IMSI remained the same for the phone and T-Mobile continued to honor the T-III order until its expiration.  The user of the phone remained Delmer Velasquez-Licona.

Affidavit of SA Provenzale - 7
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

21.     On February 14, 2020, the Honorable U.S. District Court Judge James L. Robart signed an order authorizing the initial interception of the wire and electronic communications to and from 424-395-9055/TT25 (utilized by Baldemar Martinez-Rico), 206-434-0684/TT35 (utilized by Gustavo Sandoval-Agurcia), and 206-475-7216/TT36 (utilized by Elias Montes-Sevilla).  Interception of TT35 and TT36 was terminated on March 3, 2020.  Interception of TT25 is ongoing.  During the interception periods for this investigation, we have become aware of multiple vehicles and phones utilized by the DTO to facilitate narcotics trafficking.

December 31, 2019: Seizure of "M30" pills after a narcotics transaction coordinated by Velasquez-Licona (using TT18) and Alvarez-Quinonez (using TT19)

22.     On December 10, 2019, the Honorable U.S. Magistrate Judge, Brian A. Tsuchida, signed a warrant authorizing the real-time location tracking of **TT21** (Escoto-Fiallos) and **TT22** (Cruz-Hernandez).  Both individuals are associated with Delmer Velasquez-Licona, a narcotics redistributor for the DTO.  During the tracking periods for **TT21** and **TT22**, DEA intercepted multiple calls involving narcotics activity between Velasquez-Licona and **TT21/TT22**.  Below, I will highlight two examples of narcotics activity coordinated in part over **TT21** and/or **TT22** during their initial tracking period.

23.     On December 31, 2019, at approximately 6:05 p.m. (session #1683), TT18 (Velasquez-Licona) received an incoming call from TT19 (Alvarez-Quinonez).  During the call, Alvarez-Quinonez inquired, "Where can you meet with a guy right now for one thousand [1,000] "botones" [Buttons]?"  Velasquez-Licona responded, "Send him to my neighborhood, if you want."  Alvarez-Quinonez then stated, "Send me the address immediately."  Based on my training and experience, I believe during the above conversation Velasquez-Licona agreed to give approximately 1,000 "M30" pills to an unknown third party, at the request of Alvarez-Quinonez.

24.     At approximately 6:07 p.m., TT18 sent an outgoing text message to TT19 (session #1685).  The message was in English and read: "14051 Greenwood Ave N, Seattle, WA 98133."  This is the listed address of the Saltoro Restaurant, just to the north

Affidavit of SA Provenzale - 8
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of Velasquez-Licona's residence, where we have previously observed him conduct suspected narcotics transactions.

25.    At approximately 6:30 p.m., surveillance was established near the Saltoro Restaurant.  At approximately 6:52 p.m., TT18 received an incoming call from TT19 (session #1693).  During the call, Alvarez-Quinonez stated, "Listen, the guy is there, at Chevron, in a brown Mitsubishi."  Velasquez-Licona responded, "I don't know if the guy is in a hurry, but, but if you trust me, I can tell one my brothers there to him, I just have to tell the guy where they are."  Alvarez-Quinonez responded, "Tell him just that he has go now to see him."  There is a Chevron gas station located at 14056 Greenwood Avenue N, Seattle, Washington, directly across from the Saltoro.

26.    At approximately 6:53 p.m., TT18 placed a call to 206-578-9597 (**TT22**) utilized by Jorge Cruz-Hernandez.  Investigators believe that Cruz-Hernandez lives with Velasquez-Licona.  During the call (session #1695), Velasquez-Licona asked, "Can you do me a favor?" and then continued, "go and drop some "jalecito" [work] there, outside." Cruz-Hernandez responded, "How many pills?"  Velasquez-Licona then stated, "they are there, just go, just go to the room, the backpack is there, on top….and grab two [2], two [2] little bags… each little bag has five hundred [500] of those little balls."  Cruz-Hernandez then stated, "send him down here, to Saltoro's"

27.    At approximately 6:57 p.m., an investigator observed a tan Mitsubishi SUV, bearing Washington license plate ART3517 parked at the aforementioned Chevron gas station.  According to WA DOL, the aforementioned Mitsubishi is registered to Juan Hernandez-Hernandez.  At approximately 6:59 p.m., TT18 placed an outgoing call to TT19 (session #1696).  During the call, Velasquez-Licona stated, "Tell the guy, to see if he goes to Saltoro's there is a lot of cameras there, at the gas, and the guy will arrive there in thirty [30] seconds."  I believe Velasquez-Licona was directing Alvarez-Quinonez to tell the third party in the Mitsubishi to go across the street to a restaurant where there were less cameras in an effort to remain undetected.

Affidavit of SA Provenzale - 9
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

28.     At approximately 7:00 p.m., TT18 placed a call to **TT22** (session #1697). During the call, Velasquez-Licona stated, "the guy is there already, he is in a brown Mitsubishi." At approximately 7:06 p.m., I observed, via electronic surveillance, a male walking north from the direction of Velasquez-Licona's residence to the Saltoro parking lot. At approximately 7:07 p.m., an investigator observed the Mitsubishi depart the Chevron and travel to the Saltoro restaurant parking lot. Moments later, an investigator observed the same male I observed on electronic surveillance enter into the Mitsubishi.

29.     An investigator then observed the Mitsubishi begin to drive towards Greenwood Avenue North. The Mitsubishi travelled south on Greenwood Avenue North, turned east on a nearby side street, and then began to travel north on Greenwood Avenue North. The investigator then observed the Mitsubishi arrive back at the aforementioned Chevron.

30.     Upon arriving at the Chevron, investigators observed the male exit the Mitsubishi and depart the area on foot. At approximately 7:08 p.m., TT18 placed a call to TT19 (session #1702). During the call, Alvarez-Quinonez stated, "Thank you so much dude." I believe this was Alvarez-Quinonez indicating the transaction was complete.

31.     Shortly after the male exited the Mitsubishi, investigators observed the vehicle depart the Chevron lot. At approximately 7:17 p.m., King County Sheriff's Office (KCSO) initiated a stop on the vehicle based on investigators' probable cause to believe there were narcotics in the Mitsubishi. The basis of belief for probable cause was based on several factors, including but not limited to: (1) My training and experience of how drug transactions in general occur. (2) My knowledge that Velasquez-Licona is a narcotics trafficker based on prior narcotics seizures from Velasquez-Licona. (3) The intercepted calls cited above in which Alvarez-Quinonez directs Velasquez-Licona to give an unknown individual "one thousand [1,000] "botones" [Buttons]" and the unknown individual being in a "brown Mitsubishi" at the "Chevron" where investigators then located a brown Mitsubishi. (4) The intercepted calls cited above in which Velasquez-Licona directs Cruz-Hernandez (who was utilizing **TT22**) to pick up "two [2]

Affidavit of SA Provenzale - 10
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

little bags… each little bag has five hundred [500] of those little balls," seemingly "adding up" to the "1,000" Alvarez-Quinonez directed Velasquez-Licona to deliver.  (5) The nature of the meeting between Cruz-Hernandez and the Mitsubishi being quick, in a public parking lot, and at the "Saltoro" where Cruz-Hernandez directed Velasquez-Licona to direct the unknown male to from the Chevron.

32.    During the stop, two occupants were within the vehicle.  The driver was identified as Erica LaClair and the passenger was identified as Juan Hernandez-Hernandez after both presented their driver's licenses to an officer.  The officer was unable to obtain consent to search the vehicle, so the vehicle was towed to Shoreline Police Department and the two individuals were released.

33.    At approximately 7:51 p.m., TT18 received a call from TT19 (session #1736).  During the call, Alvarez-Quinonez stated, "They released the dude.  They took the truck and they took the groceries from the inside."  I believe Alvarez-Quinonez was informing Velasquez-Licona that Law Enforcement had seized the Mitsubishi and that the "M30" pills [groceries] were still inside the vehicle.

34.    Upon the vehicle being towed to Shoreline Police Department, I and other investigators conducted a search of the vehicle, pursuant to the motor vehicle exception.  Within the vehicle, approximately 140 grams of suspected counterfeit "M30" pills were seized within two small bags.  The pills later tested positive for the presence of fentanyl.

35.    The tracking period for **TT22** (Cruz-Hernandez) ended/expired on January 23, 2020, however, based on the above seizure, I believe it is clear that Cruz-Hernandez utilized **TT22** for narcotics activity during the tracking period.  I further believe that a new tracking authorization for **TT22** will enable investigators to observe Cruz-Hernandez at close proximity as well as any new residences, vehicles, or narcotics associates now associated with Cruz-Hernandez that were previously unknown to investigators.

January 15, 2020: Consent search of Red Kio Rio (TV1) Seattle, Washington

36.    On January 15, 2020, at approximately 1:09 p.m., TT18 (206-531-9979, utilized by Velasquez-Licona at the time) received an incoming call from 52-668-103-

Affidavit of SA Provenzale - 11
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

8205 (utilized by a suspected Mexican based source of supply known only as "Cesar"/"Calamardo").  During the call (session #3490), Cesar stated, "We brought....and we brought it before December the 24th, before Christmas we brought it up, and the guy that brought it had to go back that same time, and he was the same guy that had the other stuff."  Cesar then continued, "And that guy went here to Mexico, and he was caught in Nogales and there he is tied up.....and who knows if when they will release him.  I am trying to find the location of the house where he was living, or apartment.  I am looking for the location because at that place there are a whole two and a half and 5,000 pills."  Velasquez-Licona responded, "Yes, man, and I can help you take that out, if you would want.  You are the person who is in charge."

37.     During the same call, Cesar inquired, "If I find you the location would you go there?  Everything was paid, there is no problem; the rent and everything."  Velasquez-Licona responded, "I understand now.  Is there any people there?"  Cesar responded, "No, no there's no one there.  The dude came over here but he's tied up, they have him tied up here.  I don't know if he's still alive."  Velasquez-Licona stated, "Oh that's fucked up.  So how do we get there?"  Cesar responded, "Well, that's what I am trying to figure out.  I keep calling the dude, but he doesn't call me back."  Cesar then continued, "If I get, if I get the location and the apartment number, can you head there?"  Velasquez-Licona responded, "Yeah, we'll head out there to see what's up."  Cesar then stated, "For sure, it's near Seattle, fifteen minutes, apparently."

38.     At approximately 3:09 p.m., TT18 received an incoming call from 52-668-103-8205.  During the call (session #3502), Cesar stated, "Right now they are going to send to me; right now, they are going to send me the exact location from there."  Cesar continued, "When the lady gives me the address, I, I, am going to send it to you via WhatsApp."

39.     At approximately 3:24 p.m., TT18 sent a text message to 206-476-3701 (**TT21**/utilized by Jose Fernando Escoto-Fiallos).  The text message (session #3507) inquired, "Dude, do you have a locksmith?"  Moments later, TT18 called

Affidavit of SA Provenzale - 12
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**TT21**.  During the call (session #3509), Velasquez-Licona asked Escoto-Fiallos, "Dude, do you know who can open doors?"  Velasquez-Licona continued, "Look those guys have an apartment full of work, and the guy who was staying at the apartment the mafia got him."  Escoto-Fiallos stated, "Let me text him [likely the locksmith] right now then."  Escoto-Fiallos continued, "Let me get ahold of him, and I'll wait to get back to you shortly."

40.      At approximately 3:43 p.m., TT18 called **TT21**.  During the call (session #3515), Velasquez-Licona asked, "Is it possible?"  Escoto-Fiallos responded, "Yes."  Velasquez-Licona then asked, "But he has all the right tools, so he can't make too much noise?"  Escoto-Fiallos told Velasquez-Licona, "Don't worry for that because if that's his bread and butter is because he has everything."  Velasquez-Licona continued, "We are going to go there by later tonight.  I don't know if you go in that car because there are three kilos in there."  Velasquez-Licona later stated, "If there isn't anything, well, we'll be unlucky, but anyway, at least some pieces of "white" or "dark" we'll get it."  Velasquez-Licona continued that, "This guy [the prior occupant of the apartment] was killed.  The mafia got him going back to Mexico."  Velasquez-Licona then stated, "Another mafia, you know.  They took the money and they killed him."  Velasquez-Licona continued, "These guys, they, they, don't want to lose that work."  Escoto-Fiallos then asked, "So what time should it be then?  Because it can't be so, so dark because otherwise, it would look so clear."  Velasquez-Licona then stated, "Make sure it is not too loud with those things this guy [locksmith] is going to bring."  Velasquez-Licona then stated, "The guy is going to let me know as soon as he gets the address."

41.      I believe that based on my training and experience, these intercepts are clear that Velasquez-Licona was requesting assistance from Escoto-Fiallos to break into a vacant apartment (at the request of individuals based in Mexico) to retrieve narcotics due to the prior occupant possibly being killed by individuals possibly linked to cartels in Mexico.

Affidavit of SA Provenzale - 13
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

42.     At approximately 3:55 p.m., surveillance was established in the area of Velasquez-Licona's residence: 14039 Greenwood Avenue North, Seattle, Washington, and near Escoto-Fiallos' suspected residence: 11338 3rd Avenue NE, Seattle, Washington.

43.     At approximately 4:34 p.m., TT18 called **TT21**.  During the call (session #3520), Velasquez-Licona told Escoto-Fiallos, "Come pick me up whenever you want, but bring a hammer and a screwdriver."  Velasquez-Licona continued, "Apparently the apartment door is open."  Velasquez-Licona continued that, "there are seven balls, there are seven packages there."  Escoto-Fiallos stated, "Good."  Velasquez-Licona then again told Escoto-Fiallos, "Find a, um, a hammer, then."

44.     At approximately 4:37 p.m., TT18 called **TT21**.  During the call (session #3521), Velasquez-Licona stated that, "It is at Rainier's."  Escoto-Fiallos stated, "Okay then I am almost there."

45.     At approximately 4:50 p.m., an investigator observed a green Nissan pick-up truck at 11338 3rd Avenue NE, Seattle, Washington, Escoto-Fiallos' suspected address.  The license plate on the pick-up truck was later confirmed, via remote electronic surveillance, to be WA/C37238P (TV2).  Surveillance was maintained on the green Nissan pick-up.  At approximately 5:07 p.m., an investigator observed TV2 depart the residence.

46.     At approximately 5:11 p.m., **TT21** sent a text message to TT18.  The message (session #3524) stated, "Let's go."  At approximately 5:16 p.m., TT18 sent a text message to **TT21**.  The message (session #3530) stated, "I'll be right out.  I am showering."  At approximately 5:18 p.m., I observed the Nissan pick-up (TV2) at Velasquez-Licona's residence, via remote electronic surveillance.

47.     At approximately 5:35 p.m., TT18 sent a text message to **TT21**.  The message (session #3536) stated, "Jorge is going to go help search but do not tell him about the money [if there is any].  We are going to keep it."  Based on the later events

Affidavit of SA Provenzale - 14
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

from this surveillance, I believe that "Jorge" was referring to Jorge Cruz-Hernandez, a narcotics associate of Velasquez-Licona, and user of **TT22**.

48.     At approximately 5:46 p.m., I observed, via remote electronic surveillance, three males, believed to be Velasquez-Licona, Cruz-Hernandez, and Escoto-Fiallos enter into a red Kia Rio (WA/AUW0996/TV1) and depart the area.  Surveillance was maintained on the Kia.  Tracking data for phones associated with all three individuals (TT18/Velasquez-Licona, **TT21**/Escoto-Fiallos, and **TT22**/206-578-9597/utilized by Cruz-Hernandez) indicated all three phones "travelled" with the Kia upon it departing Velasquez-Licona's residence.

49.     At approximately 6:30 p.m., the Kia arrived in the area of Rainier Avenue South, just to the north of South Thistle Street, Seattle, Washington.  An investigator observed all three males exit the Kia and access the trunk of the vehicle.  At approximately 6:33 p.m., an investigator observed two of the males head towards a building to the south east of the car, before the third male joined them.  Another investigator confirmed the address the males accessed was 8416 Rainier Avenue South, Seattle, Washington.

50.     At approximately 6:59 p.m., TT18 received an incoming call from 719-644-4597 (utilized by Cesar Rojo-Gomez).  Rojo-Gomez is believed to be an associate of "Cesar"/"Calamardo" based on the context of this call.  During the call (session #3541), Rojo-Gomez asked, "How did it go?"  Velasquez-Licona responded, "I am here inside, man, looking and looking and there is nothing.."  Rojo-Gomez then stated, "Check for me there, check for me there, right in there, inside that wall where they told you, there are some there."  Velasquez-Licona responded, "Oh, yes, in that wall where they told me, I already extracted three balls of ten each, I think that's what they are, but...Calamardo says that there is more, but for now he told me to get out of here, that he was going to call the lady so he can be sure about that, because he told me there were 5,000 of the blue ones and no, no, I could not find anything." Velasquez-Licona later stated, "I am going to

Affidavit of SA Provenzale - 15
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

video call you so he can see it." Rojo-Gomez then stated, "Alright, so I can see what the deal is there, so I can tell you where...I know where they all were there."

51.     Based on my training and experience, this exchange was Rojo-Gomez directing Velasquez-Licona (who was in the apartment) on where to search for the suspected narcotics and money that Rojo-Gomez was told were inside the apartment.

52.     At approximately 7:10 p.m., an investigator observed a male exiting the area of the aforementioned address carrying a black gym bag. The investigator then observed the individual enter the Kia. At approximately 7:24 p.m., the investigator observed another male exit the area of the aforementioned address carrying a space heater and multiple bags. The investigator then observed the male enter the driver's seat of the Kia. At approximately 7:25 p.m., the investigator observed a third male exit the area of the aforementioned address carrying a television.

53.     At approximately 7:29 p.m., Seattle Police Department (SPD) North Anti-Crime Team (ACT) initiated an investigative stop of the red Kia. Spanish speaking SPD Officers were also present to assist with translation. A SPD Officer spoke with all three subjects. The first male (who was detained and in handcuffs) stated that his name was Jorge Cruz-Hernandez, however he did not have any Washington State identification. Cruz-Hernandez stated his friend had asked him to help him move some stuff from his apartment. The SPD Officer then asked Cruz-Hernandez for consent to search his vehicle. Cruz-Hernandez agreed to allow his vehicle to be searched and was then advised of his Miranda rights by the SPD Officer.

54.     A search of the vehicle was then conducted by SPD Officers. Approximately 3.6 pounds of heroin were located inside a duffel bag, which was located on the front passenger seat floorboard (field tested positive for heroin). Cruz-Hernandez and Escoto-Fiallos denied the heroin was theirs. Velasquez-Licona then stated he did not know what was inside the packages and that he was coerced into picking up the heroin. Velasquez-Licona continued that the original owner of the apartment was killed in Mexico. All three individuals were released pending further investigation.

Affidavit of SA Provenzale - 16
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

55.     The tracking period for **TT21** (Escoto-Fiallos) ended/expired on January 23, 2020, however, based on the above seizure, I believe it is clear that Escoto-Fiallos utilized **TT21** for narcotics activity during the tracking period.  I further believe that a new tracking authorization for **TT21** will enable investigators to observe Escoto-Fiallos at close proximity as well as any new residences, vehicles, or narcotics associates now associated with Escoto-Fiallos that were previously unknown to investigators.

Information regarding **TT43** (Suspected new phone for Velasquez-Licona)

56.     Near the end of the interception period for TT18 (interception for the phone ended on February 7, 2020), DEA intercepted communications indicating that Velasquez-Licona obtained a new phone.  On February 4, 2020, at approximately 11:33 a.m., TT18 placed an outgoing call to **TT21** (Escoto-Fiallos).  During the call (session #7626), Escoto-Fiallos inquired where Velasquez-Licona was so that he (Escoto-Fiallos) could pick him up.  Velasquez-Licona responded that he was in "Magnolia" and told Escoto-Fiallos to wait because he (Velasquez-Licona) was buying a phone.

57.     On February 23, 2020, I received information from King County Sheriff's Office (KCSO) that a confidential source (CS3) utilized by KCSO had recently obtained **TT43** (971-224-9106) as a contact number for Velasquez-Licona.

58.     CS3 has cooperated with investigators, during this investigation, under an active cooperation agreement with KCSO in exchange for monetary payment.  CS3 has an arrest for alien inadmissibility.  During this investigation, CS3 has provided information, which has been corroborated by investigators.

59.     After obtaining **TT43** as a suspected new phone number for Velasquez-Licona, I obtained subpoena information for **TT43**.  **TT43** was activated on February 4, 2020, the same date Velasquez-Licona indicated he was purchasing a new phone, as noted above.  Further, through February 22, 2020 (the last toll data) **TT43** has over 25 contacts in common with TT18, the last known phone for Velasquez-Licona.  Based upon all these factors, I believe that **TT43** is a new contact number for Velasquez-Licona.  Further, I believe based on intercepts of TT18 that it is clear Velasquez-Licona utilizes

Affidavit of SA Provenzale - 17
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

his phones for narcotics activity.  I further believe that a tracking authorization for **TT43** will enable investigators to observe Velasquez-Licona at close proximity as well as any new residences, vehicles, or narcotics associates now associated with Velasquez-Licona that were previously unknown to investigators.

Information regarding **TT44**

60.     As stated previously in the section regarding the December 31, 2019, seizure of "M30" pills, this investigation has revealed that Velasquez-Licona has been supplied narcotics by Rodrigo Alvarez-Quinonez (TT19).  During the December 31, 2019 transaction, Alvarez-Quinonez directed Velasquez-Licona to deliver "M30" pills (which were eventually seized) to Juan Hernandez-Hernandez.

61.     We have also seized suspected counterfeit "M30" pills, believed to contain fentanyl from a vehicle Alvarez-Quinonez was travelling in (Jeep, CA/8GEG621). Beginning on January 17, 2020, intercepts over TT19 indicated that Alvarez-Quinonez had directed a narcotics courier (Jorge Ramos) to pick up suspected narcotics in both Los Angeles and Phoenix for transport north.

62.     On January 20, 2020, at approximately 6:33 p.m., an interdiction stop was conducted of the Jeep on northbound Interstate-5 between mile marker 73 and 74 in Chehalis, Washington. The driver provided a California driver's license (N9280429) identifying him as Jorge Alberto Ramos.  The front passenger provided a California driver's license (C3436294) identifying her as Elvira Rodriguez-Ramos.  The back passenger provided two international identifications identifying him as Rodrigo Alvarez-Quinonez.

63.     Shortly after the stop, Chehalis Police Department (CPD) utilized a narcotics detecting K-9 on the exterior of the Jeep.  The K-9 alerted to the presence of a controlled substance near the bumper of the vehicle.  Based on the DEA Seattle investigation to date, and the K-9 positive narcotics alerts, the vehicle was seized and transported to a secure location.  Alvarez-Quinonez, Ramos, and Rodriguez-Ramos were released pending further investigation.  At approximately 7:58 p.m., a State of

Affidavit of SA Provenzale - 18
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Washington telephonic search warrant for the Jeep was obtained.  On the same date, investigators executed the search warrant and seized approximately 1,974 gross grams of counterfeit "M30" pills believed to contain fentanyl located in a factory void under the driver's seat of the Jeep.

64.     Prior to the interdiction (according to tracking for TT19), Alvarez-Quinonez had spent multiple weeks in the Fresno/Selma area of California.  During this time, Alvarez-Quinonez was intercepted multiple times speaking with an unidentified female (UF7588) who was utilizing **TT44** (425-426-7588).  Based on the intercepts, investigators believe that UF7588 is a narcotics associate of Alvarez-Quinonez, based in Seattle, who assists Alvarez-Quinonez with money laundering activity.

65.     For example, on January 11, 2020, at approximately 5:34 p.m. (prior to the aforementioned seizure), TT19 (Alvarez-Quinonez) received a call from UF7588 who was utilizing **TT44**.  During the call (session #179), UF7588 stated that, "They don't understand why the heck he can't get the money over there if the name is fine.  One of these two things, either the guy is not showing a valid identification…..Because the problem, it's not the confirmation code."  Alvarez-Quinonez responded, "No.  They said….yes, but since tried way too many times to withdraw it, they blocked him, so he could not get it out."  UF7588 then responded, "Now, he said that, that if he can't get the money there, he needs to go to a place called Telecomm Telegrafos to withdraw it."  Alvarez-Quinonez responded, "I know."  UF7588 continued, "And if he can't get it from there, so then, so they could give us the money back.  Not a moment sooner because it doesn't show any problems in the system."

66.     Alvarez-Quinonez later stated in the same conversation, "And, if not, listen, the only thing you are going to say there is that the guy lost the identification and that is the reason why he is not getting it.  They guy was showing up with his driver's license.  Do you know what I mean?  If you could not withdraw it there.  That way they must return it to you right there."  Alvarez-Quinonez then inquired, "What happened with the girl's wire transferred?"  UF7588 responded, "The gi- the boy…right now he is not here,

Affidavit of SA Provenzale - 19
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

he on vacation. But, um I told that I was going to stop by." UF7588 continued, "He wants me to send him all of, all of the information. So you can throw your phone."

67.     Based on the investigation to date, and the subsequent narcotics seizure from Alvarez-Quinonez, I believe this call was regarding money-laundering activity of narcotics proceeds through various money remitters. At times, traffickers will give narcotics proceeds to an associate and have the associate send out various money remittance transfers to individuals (here, likely in Mexico) in an effort to thwart law enforcement and conceal the true origin of the currency. In my experience, traffickers in this area at times will do this with tens of thousands of dollars. By sending smaller transfers (in my experience likely under $1,000) utilizing multiple "senders," over multiple days, the activity appears less suspicious. The above call is in line with my experience.

68.     I believe UF7588, in the above call, is reporting to Alvarez-Quinonez about issues individuals attempting to withdraw a previous transfer are having. When discussing the possibility of the money being sent back to UF7588, Alvarez-Quinonez is clear, "Listen, the only thing you are going to say there is that the guy lost the identification and that is the reason why he is not getting it." I believe this was Alvarez-Quinonez providing UF7588 with a way to retrieve the returned money without arousing suspicion. Further, after reporting on the issues one transfer is having, Alvarez-Quinonez appears to inquire about another transfer. UF7588 then admits the individual that was supposed to handle that transfer is on vacation so she was going to stop by (likely to get the information needed to send the money herself).

69.     After the seizure from Alvarez-Quinonez (January 20, 2020), Alvarez-Quinonez continued to utilize TT19 for narcotics activity and still contacted **TT44** multiple times regarding suspected money laundering activity. On January 25, 2020, at approximately 7:13 p.m., TT19 placed a call to **TT44**. During the call (session #586), Alvarez-Quinonez stated, "Tomorrow, I, I will return over there, to town. That is why I need to do it now, so I can get the "tickets" and all of that." UF7588 responded, "Right

Affidavit of SA Provenzale - 20
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

on." Alvarez-Quinonez continued, "To see what's going on. What happened because they are telling me that they did not withdraw everything." UF7588 then responded, "Okay, tomorrow evening?" Alvarez-Quinonez responded, "Sounds good."

70. Based on my training and experience, I believe the above call was Alvarez-Quinonez informing UF7588 that he needed her to send money before he departed Western Washington (tracking data indicated that TT19 had returned to the Selma/Fresno area of California on January 29, 2020). UF7588 then agreed to help Alvarez-Quinonez the following evening.

71. On January 26, 2020, at approximately 7:49 p.m., TT19 received a call from **TT44**. During the call (session #612), UF7588 stated, "Right now, I am going to go the, house and I will start gathering the papers. Over there, there, there are pictures and "papers" [money], okay." Alvarez-Quinonez responded, "Yes, I only want it to the, the numbers so check how much was sent, how much of that. And so they can help me out with what was pending." UF7588 responded, "Right on. What was I going to tell you?" UF7588 then stated, "About the money." Alvarez-Quinonez stated, "Uh-huh." UF7588 then said, "I took four [4]. I will replace it back on Friday." Alvarez-Quinonez stated, "About what?" UF7588 then stated, "The money." Alvarez-Quinonez responded, "Right on!"

72. Based on my training and experience, I believe the above conversation was UF7588 informing Alvarez-Quinonez that she was going to a residence to retrieve money or "papers." In my experience, "papers" is a common slang term narcotics traffickers utilize to refer to money. Alvarez-Quinonez then informed UF7588 that he needed UF7588 to check how much had been sent (likely because he needed to figure out how much still needed to send to Mexican based sources and how much was going to be profit). UF7588 then informed Alvarez-Quinonez that she had taken "four" (likely $4,000) from the money Alvarez-Quinonez had given her but that she would replace it. Based on my training and experience, and my knowledge of Alvarez-Quinonez being a narcotics trafficker, I believe the calls between **TT44** and TT19 are consistent with

Affidavit of SA Provenzale - 21
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   money laundering activity.  Further,  I believe that a tracking authorization for **TT44** will

2   enable investigators to observe UF7588 at close proximity as well as any new residences,

3   vehicles, or narcotics associates now associated with UF7588 that were previously

4   unknown to investigators.

5   Information regarding Gustavo Sandoval-Agurcia and Jorge Uriel Esquival-Mena

6          73.    During this investigation, we also have intercepted communications over

7   206-929-8743 (TT23) utilized by Gustavo Sandoval-Agurcia.  Intercepts have revealed

8   that Sandoval-Agurcia is a redistributor for the DTO.  Sandoval-Agurcia appears to be

9   supplied by multiple individuals.  One of the individuals who supplies Sandoval-Agurcia

10  appears to be Jorge Uriel Esquivel-Mena.  During interception of TT23, we intercepted a

11  phone number 971-288-3232/TT26 utilized by Esquivel-Mena.[2]

12         74.    On January 11, 2020, at approximately 12:24 p.m. (session #72), TT23

13  (Sandoval-Agurcia) received an incoming call from TT26 (Esquivel-Mena).  The call

14  appeared to be the two discussing narcotics pricing.  During the call, Esquivel-Mena

15  states that "My boss told me that the "tires" that he can also give us a good number, I

16  think it is a good number because, because the other day he told my, my buddy and he

17  didn't believe me.  He told me, 'Guess how much they are giving the at twenty-two

18  (22)."  Sandoval-Agurcia responded, "I get that one at, at one buck less, that one you

19  mentioned."  Sandoval-Agurcia then later stated, "Bring me a sample, I just want to try it,

20  just a little bit."

21         75.    Based on my training and experience, I believe that when Esquivel-Mena

22  told Sandoval-Agurcia his "boss" would give him a good price for the "llantas,"

23  Esquivel-Mena was referring to heroin.  "Llantas," or "tires," are dark in color like

24  heroin.  Based on my training and experience, I know that "llantas" is at times used as

25  slang for heroin.  I further believe that when Esquivel-Mena stated he could give it to

26  _____

27  [2] On January 17, 2020, after initially intercepting TT26, the Honorable U.S. Magistrate Judge Brian A. Tsuchida
    signed a warrant authorizing the GPS tracking of TT26.  Through surveillance, tracking of TT26, and pen register
28  data, investigators identified Esquivel-Mena as the holder of TT26.

Affidavit of SA Provenzale - 22
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sandoval-Agurcia for twenty [20], he was likely referring to $20,000 dollars as that is consistent with the price of approximately 1 kilogram of heroin in this district. Furthermore, I believe that when Sandoval-Agurcia told Esquivel-Mena to bring him a "sample" of the suspected narcotics, Sandoval-Agurcia wanted to check the quality of the narcotics before making a larger purchase. Based on my training and experience, I know it is common for narcotics traffickers to obtain a sample of narcotics before making a larger purchase to ensure they are getting quality narcotics rather than narcotics that have been "cut" or "stepped-on" with various diluents or adulterants which lower the quality.

February 25, 2020: Interdiction stop of Sandoval-Agurcia

76.    On February 19, 2020, at approximately 5:40 p.m. (session #179), TT25 (utilized by Baldemar Martinez-Rico a narcotics associate of Sandoval-Agurcia, currently being intercepted under court order) received an incoming call from 510-378-5214 (TT38).  Spanish linguists identified the user of TT38 as Sandoval-Agurcia, based on voice comparison with previous intercepts of Sandoval-Agurcia.  During the call, Sandoval-Agurcia inquired with Martinez-Rico, "Do you have the numbers for all the crazy guys?"  Sandoval-Agurcia then continued, "Call the other guy to see what, what's up."  Later in the same conversation, Sandoval-Agurcia stated, "Call that dude to see what's up buddy.  Because they [likely customers] are asking me for shit a lot." Martinez-Rico stated, "I will call him right now and I'll see what the dude tells me."

77.    On the same date at approximately 5:42 p.m. (session #181), TT25 placed an outgoing call to 971-327-1773 (TT39).  The user of this phone is unidentified (UM1773), however the phone is subscribed to "Paco Ezquivel" and according to toll information has been in contact with 971-288-3232/TT26 (utilized by Jorge Uriel Esquivel-Mena, a suspected source of supply for Sandoval-Agurcia, as noted above). Based on subscriber information for TT39 being a similar last name to Esquivel-Mena (Ezquivel vs. Esquivel), the toll information that indicates TT39 has been in contact with Esquivel-Mena (TT26), and the context of the below intercepts, I believe it is possible

Affidavit of SA Provenzale - 23
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that the user of TT39 is an individual referred to as Esquivel-Mena's "brother" during previous intercepts with TT23 (Sandoval-Agurcia) and TT26 (Esquivel-Mena).

78.     During the call, the user of TT39 (UM1773) indicated that "the ones from down there have not been able to….cannot bring that shit over here yet."  UM1773 continued, "They [third parties] were stuck in El Paso, Texas." and continued, "The day after tomorrow [February 21, 2020], to be on the safe side."  Martinez-Rico then asked UM1773, "Tell him to give him [Sandoval-Agurcia] a call because they get anxious over here.  He said that he could not be empty."

79.     On the same date, at approximately 5:44 p.m. (session #182), TT25 placed an outgoing call to 510-378-5214 (TT38).  During the call, Martinez-Rico stated to Sandoval-Agurcia, "I just talked to his brother and he told me that he was going to tell him right now to call you."

80.     Based on my training and experience, I believe that like the prior dealings we intercepted with Sandoval-Agurcia (over TT23) and Martinez-Rico (TT25) this conversation was similar, in that Sandoval-Agurcia (via TT38) was contacting Martinez-Rico to get ahold of individuals for the purpose of narcotics trafficking.  Based on the intercept with TT25 and TT39 (UM1773/session #181), I believe that Martinez-Rico called UM1773 only after Sandoval-Agurcia (via TT38) requested that Martinez-Rico contact him to get the status on a suspected narcotics shipment.  I believe the conversation between Martinez-Rico and UM1773 (likely Esquivel-Mena's "brother") was regarding a narcotics shipment.  I believe this based on Martinez-Rico telling UM1773 to have his brother call Sandoval-Agurcia because he (likely Sandoval-Agurcia) could not be empty because they (likely Sandoval-Agurcia's associates or customers) were getting "anxious."  I believe this may have been a reference to Sandoval-Agurcia being low on narcotics supply.

81.     I further believe that when UM1773 stated they (third parties) were stuck in El Paso, Texas, and continued that to be on the safe side, it would be for the day after tomorrow (February 21, 2020), he was letting Martinez-Rico know when the narcotics

Affidavit of SA Provenzale - 24
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

shipment would arrive. On February 21, 2020, the Honorable U.S. Magistrate Judge Mary Alice Theiler signed a warrant authorizing location tracking for TT39. Upon receiving location data for TT39, I observed the phone was "pinging" near the Oakland area of California, the same general area as TT26 (Esquivel-Mena/UM1773's suspected "brother.")

82.     On February 24, 2020, at approximately 9:20 p.m., TT25 (Martinez-Rico) placed a call to 971-327-1773 (TT39/UM1773). During the call (session #366) Martinez-Rico inquired, "What's going on with the Big lip?" UM1773 stated, "When he told me, he told me maybe for tomorrow." Martinez-Rico responded, "Until tomorrow?" UM1773 stated, "Yeah." Martinez-Rico then stated, "You should tell your buddy over here."

83.     Based on my training and experience, I believe Martinez-Rico was inquiring about the status of the narcotics shipment he previously had inquired about on February 19, 2020, for the purpose of informing Sandoval-Agurcia who I believe Martinez-Rico was referring to as UM1773's "buddy." Further, I believe that when UM1773 stated, "He told me maybe for tomorrow," he was indicating that his "brother' (Esquivel-Mena) had informed him that the following day a suspected narcotics shipment would arrive.

84.     On the same date, at approximately 10:22 p.m., tracking data for TT39 indicated that the phone began to travel north away from the northern Oakland, California area. At approximately 10:52 p.m., tracking data for TT39 indicated the phone was north of Sacramento, California. After this "ping," I stopped receiving electronic tracking data for TT39; indicating TT39 had been powered down or had no signal. Based on my training and experience, couriers at times will power down their phones when transporting narcotics in an effort to thwart law enforcement tracking.

85.     While tracking data for both TT39 (UM1773) and TT26 (Esquivel-Mena) had both recently indicated the phones were staying near the Oakland area of California, previous tracking data for TT26 (Esquivel-Mena) had indicated that TT26 at times would

Affidavit of SA Provenzale - 25
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

spend extended time (multiple days or weeks) near the Beaverton area of Oregon at an apartment complex located at 4900 SW Greensboro Way, Beaverton, Oregon (Westbury Apartments).

86.     On February 25, 2020, at approximately 1:09 p.m., tracking data for Target Vehicle 6 (TV6) a Nissan Sedan utilized by Sandoval-Agurcia (WA/BQX2459) indicated the vehicle was travelling south on Interstate-5 near Federal Way, Washington.  On the same date, at approximately 1:45 p.m., tracking data for TV6 indicated the vehicle was near Olympia, Washington.  Tracking data for TT37 (also utilized by Sandoval-Agurcia) also indicated the phone was "travelling" with TV6.

87.     At approximately 1:52 p.m., tracking data for TT39 (UM1773) indicated the phone had been powered on and was in the Beaverton area of Oregon.  At approximately 2:22 p.m., tracking data for TT39 indicated the phone was "pinging" at 4900 SW Greensboro Way, Beaverton, Oregon (Westbury Apartments).

88.     Based on past tracking data for TT26 (Esquivel-Mena, UM1773's "brother") being at the same apartment complex in the past, intercepts over the last few days with TT25 (Martinez-Rico) and TT39 (UM1773) indicating a suspected narcotics shipment would be arriving soon, and TV6 travelling south towards Oregon, investigators established surveillance at the aforementioned apartment complex.

89.     At approximately 4:22 p.m., an investigator observed TV6 and Sandoval-Agurcia at the Westbury apartments.  The investigator observed that Sandoval-Agurcia was walking towards apartment #4695.  Tracking data also indicated TV6 was located at the apartment complex.  As approximately 4:25 p.m., tracking data for TT37 indicated the phone was also at the Westbury apartments.

90.     At approximately 4:45 p.m., an investigator observed Sandoval-Agurcia and two other unknown individuals walking together.  The investigator observed Sandoval-Agurcia was holding a bag.  At approximately 4:50 p.m., Sandoval-Agurcia entered TV6 alone and departed the apartments.

Affidavit of SA Provenzale - 26
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

91.     Surveillance was maintained on TV6, which travelled back towards Interstate-5 (per surveillance and tracking data) and travelled north into Washington State.

92.     At approximately 7:01 p.m., an interdiction stop was conducted on TV6 on northbound Interstate-5 south of mile marker 72 in Chehalis, Washington. The driver provided a Washington driver's license (WDLFPCH645FB) identifying him as Gustavo Sandoval-Agurcia.

93.     Shortly after the stop, a narcotics detecting K-9 was utilized on the exterior of TV6.  The K-9 alerted to the presence of a controlled substance on the vehicle.  Based on the DEA Seattle investigation to date, intercepts, and the K-9 positive narcotics alerts, the vehicle was seized and transported to a secure location.  Sandoval-Agurcia was released pending further investigation.

94.     On the same date, a State of Washington search warrant for TV6 was obtained.  On the same date, investigators executed the search warrant and seized approximately 2.6 pounds of suspected cocaine (field tested positive) and 1 pound of suspected methamphetamine (field-tested positive) from a concealed compartment or "trap" under the front passenger's seat of TV6.

Information regarding **TT45**

95.     After the interdiction, on February 27, 2020, at approximately 6:06 p.m., TT25 (Martinez-Rico, a narcotics associate of UM1773, Esquivel-Mena, and Sandoval-Agurcia) placed an outgoing call to TT39 (UM1773).  During the call (session #462), UM1773 stated that, "They [police] took it with the car and everything.  He [Sandoval-Agurcia] stated that they had the dogs go through the car and they didn't find anything." Martinez-Rico informed UM1773 that he believed if the police had actually taken the Nissan, they also would have taken Sandoval-Agurcia.

96.     UM1773 then stated, "When he [Sandoval-Agurcia] left, right after he left, Uriel [Esquivel-Mena] called me, telling me to call, to call Moreno [Sandoval-Agurcia], because there were some dudes there.  When he went out of the apartments, when he got

Affidavit of SA Provenzale - 27
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

in the car, that there were some white guys there, that in a White Ram."  UM1773 continued, "Then, then when Uriel told me, he told me, I came, I went to the house.  I hauled ass over here to see."  Dude, I didn't see anyone."  UM1773 later confirmed Sandoval-Agurcia took "a whole one, and one [1] water."

97.     Based on my training and experience, I believe that when UM1773 was referring to Uriel calling him and asking him (UM1773) to call Sandoval-Agurcia because "there were some white guys there, in a white Ram," UM1773 was referring to Esquivel-Mena calling him (UM1773) and informing him (UM1773) that Sandoval-Agurcia believed he had observed law enforcement at the Westbury Apartments in Beaverton, Oregon.

98.     One of the investigators utilized for surveillance the day of the interdiction was driving a white Dodge Ram.  I believe Sandoval-Agurcia observed the vehicle and called Esquivel-Mena to inform him about possible law enforcement presence.  Further, I believe when UM1773 stated that Sandoval-Agurcia took "a whole one, and one [1] water" he was referring to the kilogram of cocaine (whole one) and pound of methamphetamine (water) later seized from Sandoval-Agurcia.

99.     A review of toll data from February 25, 2020, indicates that both UM1773 (TT39) and Sandoval-Agurcia (TT37) were in contact with **TT45**/707-631-6709 during the time the narcotics transaction took place at the Westbury Apartments in Beaverton, Oregon.  Specifically, from 4:22 p.m. until 4:50 p.m. (when Sandoval-Agurcia was observed at the Westbury Apartments by surveillance) TT37 was in contact with **TT45** approximately ten times**.**  TT39 (UM1773) was also in contact with **TT45** during this timeframe according to toll data.  Based on my training and experience, and the intercept above, I believe that this indicated **TT45** may be a new phone number for Esquivel-Mena**.**

100.     On February 28, 2020, at approximately 8:25 p.m., TT25 (Martinez-Rico) received an incoming call from **TT45**/707-631-6709.  Spanish linguists identified the

Affidavit of SA Provenzale - 28
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

user of **TT45** as Esquivel-Mena, based on voice comparison with previous intercepts of TT26.

101.   During the call, Martinez-Rico stated, "I asked him [Sandoval-Agurcia], if he wanted your number to, well, I would give it to him so he could call you, and he told me no, that he was find the car [first]." Esquivel-Mena stated that, "As soon as he [Sandoval-Agurcia] called me [when Sandoval-Agurcia picked up the narcotics, to check for suspected surveillance], I told my sister, and my sister went outside and my sister said, 'there is nobody here.' Later in the same conversation, Esquivel-Mena stated, "We don't know if he [Sandoval-Agurcia] gave the "comida" [food]….you know what I mean?" Esquivel-Mena continued, "I was giving it at cheap price, for real, they were at thirty-two [32] and thirty-three [33] up there."

102.   Based on my training and experience, I believe this call indicates that Esquivel-Mena was aware of the narcotics transaction (as the intercept with UM1773 and Martinez-Rico had alluded to [session #462]). Further, I believe when Esquivel-Mena stated he was giving it at a cheap price, he was indicating that thirty-two and thirty-three (thousand) is the typical price of a kilogram of cocaine and he (Esquivel-Mena) had sold it to Sandoval-Agurcia at a cheaper price.

103.   Based upon all these factors, I believe that **TT45** is a new contact number for Esquivel-Mena. Further, I believe based on intercepts of TT26 (Esquivel-Mena's previous known number) and the above-mentioned seizure, it is clear Esquivel-Mena utilizes his phones for narcotics activity. I further believe that a tracking authorization for **TT45** will enable investigators to observe Esquivel-Mena at close proximity as well as any new residences, vehicles, or narcotics associates now associated with Esquivel-Mena that were previously unknown to investigators.

Information regarding **TT46**

104.   After the aforementioned interdiction of Sandoval-Agurcia, Sandoval-Agurcia appeared to "drop" all his known phones. Investigators are currently tracking a vehicle (Honda Civic, WA/BQJ5136/TV5) known to be associated with Elias Montes-

Affidavit of SA Provenzale - 29
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sevilla, a close narcotics associate of Sandoval-Agurcia per wire intercepts.  On February 27, 2020, after the interdiction of Sandoval-Agurcia, tracking data for TV5 indicated the vehicle was located at 2211 S Star Lake Road, Federal Way, Washington; the Club Palisades Apartments.

105.    At approximately 11:15 a.m., investigators established surveillance at the apartment complex and located TV5 parked at the southeast corner of building "3."

106.    From approximately 11:30 a.m. to 11:45 a.m. an investigator observed an unidentified male at the apartment complex (UM1/described as 16 to 18 Years Old, White, 5'10 to 6'00 tall, approximately 150 lbs.).  The investigator observed UM1 exit the rear of the ground floor southernmost apartment of Building "3."  The investigator then observed UM1 carry a white plastic garbage bag to a nearby dumpster and deposit the bag into the dumpster.  The investigator observed the male make an additional trip from the rear patio of the same apartment to the dumpster carrying two white plastic bags, which he deposited into the dumpster as well.

107.    At approximately 11:45 a.m., an investigator observed a female exit from the front of the southernmost ground floor apartment of building "3" and enter the passenger side of the gray Honda (TV5).  Shortly thereafter, investigators observed UM1 exit from the same apartment and enter the rear passenger door of TV5.  Shortly thereafter, an investigator observed a male who they positively identified as Elias Montes-Sevilla exit from the same apartment and enter the driver's door of TV5.  The three individuals then departed the area in TV5.

108.    Shortly thereafter, an investigator retrieved three white plastic garbage bags from the dumpster where another investigator had observed the bags being deposited.  Investigators searched the bags of garbage at a secondary location and noted the following: Two bags contained no items of note.  The third bag contained a digital scale, aluminum foil with burn marks, suspected narcotics plastic "kilogram wrappings" with residue, and miscellaneous documents among other things (some of the documents had

Affidavit of SA Provenzale - 30
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the name "Janeth Campos-Barajas" on them, a known associate of Montes-Sevilla and Sandoval-Agurcia).

109.    Previously, investigators have observed tracking data for Sandoval-Agurcia indicate he had travelled to the same apartment complex.  I have also observed a vehicle registered to "Wilmer Omar Avila Gamez" (according to Washington Department of Licensing) parked at this apartment complex (white Nissan sedan WA/BRH5289).  I noted the vehicle due to it being registered at 4455 NE 12th St, Apartment 28-6, Renton, Washington.  This address/apartment also has been utilized as a registration address by Montes-Sevilla.  Further, during this investigation, we have intercepted a phone in contact with Sandoval-Agurcia (TT23) subscribed to "Wilmer Avila" – **TT46**/425-496-4703.  Some of the intercepted calls over **TT46** are regarding suspected narcotics activity.

110.    For example, on January 17, 2020, at approximately 8:38 p.m. (session #486), TT23 (Sandoval-Agurcia) placed a call to **TT46** (UM4703).  During the call, Sandoval-Agurcia inquired, "Are you going to want the whole one of "aqua" [water]?"  UM4703 replied, "Yes."  Sandoval-Agurcia continued, "All right then.  So, I'm around here.  Where should we meet?"  Sandoval-Agurcia then later asked, "Do you remember where we go wash the cars?"  UM4703 stated, "Yeah."  Sandoval-Agurcia then asked, "You're already near there, right?"  UM4703 stated, "Yes, yes, yeah.  Yes, maybe like, maybe like fifteen minutes."  Sandoval-Agurcia then stated, "Take a little bag.  Because I don't have a little bag.  I have that in whole."  UM4703 stated, "Yeah, I'll get."  UM4703 later inquired, "It's, it's going to be one [1] and a half [1/2]."  Sandoval-Agurcia inquired, "Do you have a scale?  Do you have a scale then?"  UM4703 replied, "All right then."  During a separate intercept on January 19, 2020, at approximately 5:24 p.m. (session #635), TT23 received an incoming call from **TT46**.  During the call, UM4703 inquired with Sandoval-Agurcia if Sandoval-Agurcia had gotten "aguita" [water] yet.  Sandoval-Agurcia said tomorrow to which UM4703 said all right then.

Affidavit of SA Provenzale - 31
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

111.    Based on my training and experience, I believe during the above intercepts Sandoval-Agurcia was negotiating the sale of crystal methamphetamine.  "Water" in my experience is often used as a slang term for methamphetamine.  Further, we recently seized methamphetamine from Sandoval-Agurcia as noted above, further indicating that "water" he is referring to is in fact methamphetamine.  Additionally, when Sandoval-Agurcia was talking about a "whole one" I believe, based on the quantity we seized form him during the interdiction, that he was likely referring to a pound of methamphetamine. I also believe when Sandoval-Agurcia told UM4703 to, "Take a little bag.  Because I don't have a little bag I have that in whole" he was informing UM4703 in order to conceal the narcotics, he [UM4733] would need a bag.  I further believe that when Sandoval-Agurcia inquired if UM4703 had a "scale" this further indicated the "water" he was referring to was narcotics, as in my experience traffickers frequently weigh their product with digital scales.

112.    While I cannot say for certain if the registered owner of the Nissan I have observed at the Club Palisades Apartments (WA/BRH5289; registered to Wilmer Omar Avila Gamez) is the same individual using the phone subscribed to "Wilmer Avila" – **TT46**, I believe it is strong possibility for multiple reasons to include: (1) The vehicle is registered to an address associated with Montes-Sevilla, who is a known narcotics trafficker in this investigation.  (2) The vehicle was observed, and may be associated with an apartment complex from which we conducted a "trash pull" after observing Montes-Sevilla leave and which resulted in the seizure of narcotics materials/packaging. (3) **TT46** is subscribed to "Wilmer Avila" and the car is registered to a similar name.

113.    Even if the white Nissan is not utilized by the user of **TT46**, and even if **TT46** is not associated with the apartment complex, the user of **TT46** (UM4703) has still been intercepted discussing suspected narcotics activity with Sandoval-Agurcia, a known narcotics trafficker from who we have seized narcotics.  I believe that information alone indicates that the user of **TT46** (UM4703) utilizes **TT46** for narcotics trafficking activity. I further believe that a tracking authorization for **TT46** will enable investigators to

Affidavit of SA Provenzale - 32
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

observe UM4703 at close proximity as well as any new residences, vehicles, or narcotics associates associated with UM4703 that were previously unknown to investigators.

## BACKGROUND INFORMATION CONCERNING CELLPHONES

114.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it.  Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.  The IMSI numbers for each of the **target telephones** area set forth above.

115.    Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course.  The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call.  They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content.  In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

Affidavit of SA Provenzale - 33
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

116.    Based my training and experience, I know that a cell phone can also be used to exchange text messages with email accounts.  The email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

117.    Based on my training and experience, I know that cellular phones can connect to the internet via a cellular network.  When connecting through a cellular network, internet communications sent and received by the cellular phone each contain the same unique identifier that identifies cellular voice communications, such as an ESN, MEIN, MIN, SIM, IMSI, MSISDN, or IMEI.  Internet communications from a cellular phone also contain the IP address associated with that cellular phone at the time of the communication.  Each of these unique identifiers can be used to identify parties to a communication without revealing the communication's contents.

118.    In my training and experience, I have learned that each of the wireless providers listed in Attachment A-1 and A-2 is a company that provides cellular telephone access to the general public.  I also know that certain providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data (also known as GPS data or latitude-longitude data) and cell-site data (also known as "tower/face information" or cell tower/sector records).  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the cell towers (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call

Affidavit of SA Provenzale - 34
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

119.    Based on my training and experience, I know that each of the wireless providers listed in Attachment A-1 and A-2 can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the wireless provider's network or with such other reference points as may be reasonably available.

120.    When using a cellular connection to receive or transmit data, a cellular phone typically utilizes a cell tower to make telephone calls, send or receive text messages, send or receive emails, surf the internet, carry out application initiated data transfers, among other things.

121.    Based on my training and experience, I know that each of the wireless providers listed in Attachment A-1 and A-2 can collect cell-site data about the target telephones.  Based on my training and experience, I know that for each communication (including data connections) a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers, such as the wireless providers listed in Attachment A-1 and A-2, typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

122.    Different service providers use different systems, applications, and reports to collect or analyze cell site data.  These systems, applications, and reports are referred to by a variety of names including, but not limited to real-time tool or "RTT" (Verizon), Periodic Location Updates or "PLU" (Verizon), per call measurement data or "PCMD" (Sprint), Network Event Location System or "NELOS" (AT&T), EVDO, ALULTE,

Affidavit of SA Provenzale - 35
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Timing Advance, and TruCall. RTT data, for example, estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

123. Based on my training and experience, I know that wireless providers such as the wireless providers listed in Attachment A-1 and A-2 typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the wireless providers listed in Attachment A-1 and A-2 typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators.

124. Modern cell phones allow users to switch their telephone numbers, use multiple telephone numbers on a single device, and transfer their telephone number to a different cell phone. These changes can be made with the assistance of the wireless provider or by taking actions such as changing the "SIM card" (short for "subscriber identity module card") of a cellphone. To provide for any such changes made to the Target Cell Phone, Attachment A specifies that the property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone

Affidavit of SA Provenzale - 36
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

## AUTHORIZATION REQUEST

125.    Based on the foregoing, I request that the Court issue the proposed search warrants and pen-trap orders, pursuant to Federal Rule of Criminal Procedure 41, 18 U.S.C. § 2703(c), and  18 U.S.C. § 3123.

126.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice to the subscriber or user of the Target Cell Phone until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  *See* 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  *See* 18 U.S.C. § 3103a(b)(2).

127.    I further request that the Court direct each of the wireless providers listed in Attachment A-1 and A-2 to disclose to the government any information described in Attachment B that is within the possession, custody, or control of.  I also request that the

Affidavit of SA Provenzale - 37
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Court direct each of the wireless providers listed in Attachment A-1 and A-2 to furnish

2  the government all information, facilities, and technical assistance necessary to

3  accomplish the collection of the information described in Attachment B unobtrusively

4  and with a minimum of interference with the wireless provider's services, including by

5  initiating a signal to determine the location of the Target Cell Phone on the wireless

6  provider's network or with such other reference points as may be reasonably available,

7  and at such intervals and times directed by the government.  The agency shall reasonably

8  compensate each of the wireless providers listed in Attachment A-1 and A-2 for

9  reasonable expenses incurred in furnishing such facilities or assistance.

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

Affidavit of SA Provenzale - 38
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

128. Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant by serving the warrant on each of the wireless providers listed in Attachment A-1 and A-2. Because the warrant will be served on the wireless providers listed in Attachment A-1 and A-2, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

Geoffrey Provenzale
Special Agent
Drug Enforcement Administration

The above-named agent provided a sworn statement to the truth of the foregoing affidavit by telephone on 11th day of March, 2020

MICHELLE L. PETERSON
United States Magistrate Judge

Affidavit of SA Provenzale - 39
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**EXHIBIT 1**

DECLARATION

I, Stephen Hobbs, declare as follows:

1.      I am a duly appointed Assistant United States Attorney for the Western District of Washington, and I have primary responsibility for representing the interests of the United States herein.

2.      I make this declaration in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) with an integrated pen-trap order pursuant to 18 U.S.C. §§ 3122 and 3123.  Pursuant to 18 U.S.C. § 3122(a)(1), I am the applicant for purposes of the pen-trap portion of the requested warrant and order.

3.      Pursuant to 18 U.S.C. § 3122(b), I certify that the DEA is the law enforcement agency conducting the investigation in this matter and that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by that agency.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing Application is made on the basis of information officially furnished, and on that basis I verily believe such information to be true.

Executed this 11th day of March 2020.

_____
Stephen Hobbs
Assistant United States Attorney

EXHIBIT 1 -- PAGE 1
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT A-1**

**Property to Be Searched and Subscriber/Subject Information**

1.      Records and information associated with the cellular phones:

**Target Telephone 21**, assigned call number **206-476-3701** with International Mobile Subscriber Identity (IMSI) 310260078464970.  **TT21** has a listed subscriber of "Fernando Vasquez" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

**Target Telephone 22**, assigned call number **206-578-9597** with IMSI 310260060984245.  **TT22** has a listed subscriber of "Soledad Vazquez" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

**Target Telephone 43**, assigned call number **971-224-9106** with IMSI 310260350480619.  **TT43** has a listed subscriber of "Leon Levis" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

**Target Telephone 44**, assigned call number **425-426-7588** with IMSI 310260185523947.  **TT44** has a listed subscriber of "Trinidad A Galeana" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

**Target Telephone 46**, assigned call number **425-496-4703** with IMSI 310260071600170.  **TT46** has a listed subscriber of "Wilmer Avila" and has service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

2.      The property to be searched includes:  (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

3.      "T-Mobile" is identified in Attachment B as the "**Wireless Provider.**

ATTACHMENT A-1
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)
PAGE 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

**ATTACHMENT A-2**

**Property to Be Searched and Subscriber/Subject Information**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.      Records and information associated with the cellular phones:

**Target Telephone 45**, assigned call number **707-631-6709** with IMSI 310150730417601.  **TT45** has a listed subscriber of "Angelica Castillon" and has service provided by AT&T/Cricket Wireless, wireless telephone service providers headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408.

2.      The property to be searched includes:  (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

3.      "AT&T/Cricket Wireless" is identified in Attachment B as the "**Wireless Provider.**

**ATTACHMENT B**

**Particular Things to be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701-2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127.  As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Cell Phone.  **This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8).**  Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below.  *See* 18 U.S.C. § 3103a(b)(2).

**I.   Section I:  Information to be Disclosed by Wireless Provider**

1.      **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A:

a.      Names (including subscriber names, user names, and screen names);

b.      Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.      Local and long distance telephone connection records for 60 days prior to March 11, 2020;

d.      Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for 60 days prior to March 11, 2020;

e.      Length of service (including start date) and types of service utilized;

f.      Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital

ATTACHMENT B
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)
PAGE 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

g.     Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.     Means and source of payment for such service (including any credit card or bank account number) and billing records.


**2.     Pen Register/ Trap and Trace Data and Associated Subscriber Records to Be Provided for a Period of 45 days from March 11, 2020.**

a.     The Wireless Provider shall install and monitor pen-trap devices to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone including the date, time, and duration of the communication, and the following, without geographic limit and without notice to the subscriber:

(i)     IP addresses associated with the cell phone device or devices used to send or receive electronic communications;

(ii)    Any unique identifiers associated with the cell phone device or devices used to make and receive calls with the cell phone number described in Attachment A, or to send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN;

(iii)   IP addresses of any websites or other servers to which the cell phone device or devices connected; and

(iv)    Source and destination telephone numbers and email addresses.

b.     On a 24-hour-a-day basis, for the duration of the authorized pen-trap devices, the Wireless Provider shall provide the following records for those subscribers whose identifiers are obtained pursuant to the use of the pen-trap devices:  published or non-published subscriber names and addresses, including billing addresses.

ATTACHMENT B
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)
PAGE 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.      **Historical Cell Cite Location Information.**

a.      All records and other information (**not including the contents of communications**) relating to wire and electronic communications sent or received by the Account from **January 15, 2020, through March 10, 2020**, including:

i.      the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

ii.      historical cell site information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received.  This information is to be provided irrespective of the application, name, or report utilized by the Wireless Provider.  Accordingly, this information includes the following data sets to the extent that they are collected by the Wireless Provider:  RTT, PLU, PCMD, NELOS, EVDO, TruCall, ALULTE, and Timing Advance.

b.      The physical address and coverage maps of cell towers used by the Target Cellular Phones.

1.      **Prospective Cell Site Location Information.**

a.      All information about the location of the Target Cell Phones described in Attachment A for **a period of 45 days from March 11, 2020,** during all times of day and night.  This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.      The physical address and coverage maps of cell towers used by the Target Cell Phone.

2.      **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.      All information about the location of the Target Cell Phones

ATTACHMENT B
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)
PAGE 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

described in Attachment A for **a period of 45 days from March 11, 2020,** during all times of day and night.  This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

        b.    The physical address and coverage maps of cell towers used by the Target Cellular Phones.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of the Wireless Provider, the Wireless Provider is required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), The Wireless Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Wireless Provider's services.  The government shall compensate the Wireless Provider for reasonable expenses incurred in furnishing such facilities or assistance.

## II.    <u>Section</u> II:  Information to Be Seized by the Government

1.    All information described above in Section I that constitutes evidence of violations of Distribution of Controlled Substances, in violation of 21 U.S.C. § 841(a)(1), and/or conspiracy to commit that same offense in violation of 21 U.S.C. § 846 as well as Money Laundering, and conspiracy to commit the same, in violation of 18 U.S.C. § 1956 involving Jose Fernando Escoto-Fiallos, Jose Cruz-Hernandez, Delmer Velasquez-Licona, UF7588, Jorge Uriel Esquivel-Mena, and UM4703.

2.    All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

ATTACHMENT B
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)
PAGE 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3.      All non-content dialing, routing, addressing, and signaling information provided pursuant to 18 U.S.C. §§ 3121-3127.

4.      Location Information regarding the Target Cellular Phones.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Wireless Provider in order to locate the things particularly described in this Warrant.

ATTACHMENT B
USAO 2019R00980 (TT21 TT22 TT43 TT44 TT45 TT46)
PAGE 5